**UNITED STATES of America, Appellee,**

v.

**Lawrence A. WILSON, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Henry Francis ENRIQUEZ, Appellant.**

**Nos. 84–1975, 84–2240.**

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 14, 1985.

Decided March 25, 1986.

Rehearing Denied May 13, 1986
in No. 84–1975.

Rehearing Denied May 14, 1986
in No. 84–2240.

James A. Bingley and Bernard Edelman, St. Louis, Mo., for appellants.

Frederick R. Buckles, Asst. U.S. Atty., St. Louis, Mo., for appellee.

Before HEANEY, Circuit Judge, HENLEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

JOHN R. GIBSON, Circuit Judge.

Lawrence Wilson and Henry Enriquez were convicted in separate trials before the same district judge [1] of taking by force and violence, from the presence of Barbara Ann Dontrich, a manager at the State Bank of DeSoto, money belonging to the Bank, and with forcing Mrs. Dontrich to accompany them against her will, in violation of 18 U.S.C. § 2113(a), (d), (e) (1982 & Supp. II 1984).[2] In their separate appeals, which

---

1. The Honorable John F. Nangle, Chief Judge, United States District Court for the Eastern District of Missouri.

2. 18 U.S.C. § 2113(a), (d), (e) provide:

(a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association; or * * *

　　*　　*　　*　　*　　*　　*

(d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined not more than $10,000

are here consolidated, the appellants raise numerous evidentiary and procedural issues which they contend require reversal of their convictions. Principal among these are the following: Wilson contends that the district court erroneously failed to suppress his post-arrest statements which he argues were involuntary. Enriquez contends first, that his fifty-year sentence is grossly disproportionate to the severity of his offense, and second, that the trial court erroneously failed to suppress identification evidence that was the product of an impermissible suggestive photo-identification procedure. We affirm the conviction of both Wilson and Enriquez.

### Facts

The evidence presented in the two trials varied in only minor details. We will refer to these differences insofar as they are material to the issues discussed. The incident involved in this case began at approximately 10:00 p.m. on August 18, 1983. John and Barbara Dontrich were at home with their two children, aged eight and eleven years. While preparing for bed, John Dontrich answered a loud knocking at the door. A man shouted that he had a special delivery letter. Mr. Dontrich looked through a window in the door, and saw two men on the porch, one masked and attempting to hide. The second man was unmasked and Mr. Dontrich testified that he could see his face and outline. Tr. II–97[E].[3] Mr. Dontrich testified also that he saw a car located partially in the driveway and the road in front of his home. As Mr. Dontrich ran back toward his bedroom he heard the sound of his door being broken in and the men entering the house.

The intruders entered the bedroom, held Mr. Dontrich at gunpoint on the floor and handcuffed his hands behind his back. The intruders ordered Mrs. Dontrich to douse all the lights in the house. She was then forced, along with her daughter, to get on to the bed. The only light which remained on was a closet light in the children's bedroom. All were forbidden to look at the intruders.

The intruders held the Dontrich family hostage in their home for the entire night. During this time Mr. and Mrs. Dontrich testified, the unmasked intruder did all the talking and appeared to be in control. Tr. II–115[E]. The intruders brandished a device which they described, and which the Dontrichs took to be, a bomb. The device actually was four railroad fuses taped together with a battery and a timing device to look like a bomb. The intruders were armed with a shotgun and either an automatic pistol or a MAC 10, a .45 automatic weapon.[4] Tr. II–109, 110[E]. The intruders told the Dontrichs that there were other members of their group outside, and that all the Dontrichs' neighbors were under similar assault. The unmasked intruder laughed when Mrs. Dontrich asked why they were being terrorized.

During the night the masked intruder left, taking the Dontrich truck, and did not return. The other intruder stood guard over the family in their bedroom for the remainder of the night. Towards morning, he went into the bathroom and donned, for the first time, a false beard beneath a bandana. Later he added sunglasses. At this time the intruder made clear his intention to take Mrs. Dontrich to the bank at

or imprisoned not more than twenty-five years, or both.

(e) Whoever, in committing any offense defined in this section, or in avoiding or attempting to avoid apprehension for the commission of such offense, or in freeing himself or attempting to free himself from arrest or confinement for such offense, kills any person, or forces any person to accompany him without the consent of such person, shall be imprisoned not less than ten years, or punished by death if the verdict of the jury shall so direct.

3. Throughout this opinion "[E]" will designate transcript from the Enriquez trial and "[W]" will designate transcript from the Wilson trial.

4. This is one point on which the testimony in both cases differed. Wilson testified that Enriquez carried a MAC 10, a .45 automatic weapon, when he entered the Dontrich home. Tr. 4–106[W]. Wright testified that Enriquez carried an automatic pistol. Tr. 1–56[E]. John Dontrich testified also to seeing a pistol. Tr. II–109, 110[E].

the usual opening time and rob the bank. Mrs. Dontrich was responsible for opening the bank that morning.

Before they left the house the intruder directed Mrs. Dontrich to tie her daughter's hands, and to tie her son to a chair in the bedroom. He instructed them that he would leave the "bomb" in the house and detonate it by remote control if he or his waiting accomplices had any reason to believe the police had been called. Tr. II–127[E]. Mrs. Dontrich said goodbye to her husband and children and left.

The intruder took Mrs. Dontrich at gunpoint to her car and forced her to drive to the State Bank of DeSoto. There they met another bank employee, Doris Arnold. The three entered the bank building and Mrs. Dontrich turned off the alarms and opened the bank doors. The intruder told Mrs. Dontrich to tell Doris Arnold what was happening. Ms. Arnold then watched as Mrs. Dontrich, at the robber's direction, took money from the vault and placed it in his briefcase. The robber repeated his threat about the bomb, instructed Mrs. Dontrich to wait thirty minutes before she called the police, and left.

Michael Wright, an unindicted accomplice, testified at both trials pursuant to a plea-bargain agreement. He identified himself as the masked intruder, and Frank Enriquez as the unmasked intruder. He testified that Enriquez planned the robbery of the State Bank of DeSoto and elicited his and Lawrence Wilson's assistance. He also testified that, prior to the invasion of the Dontrich residence, he conducted surveillance of the house and its residents to learn their routine. He went on surveillance missions twice with Enriquez and once with Wilson. On his mission with Wilson, they noted that there were small children in the family and reported that fact to Enriquez. Finally, he testified that he gave Enriquez materials with which to make the fake bomb. Both Wright and Enriquez's fingerprints were found on the device retrieved from the Dontrich home.

Enriquez was convicted and sentenced to fifty years imprisonment and ordered to pay $5600 in restitution under the Victim and Witness Protection Act of 1982, 18 U.S.C. § 3579 (1982). Wilson was sentenced to fifteen years imprisonment and ordered to pay $5600 in restitution under the Act.

## I. *Lawrence Wilson*

Wilson challenges his conviction on three grounds. First he charges as error the denial of his motion to suppress two post-arrest statements which he made to the police, in the second of which he confessed to his involvement in the hostage-taking and robbery. Second, he argues that the trial court erred in denying his counsel's motion for a continuance in order to evaluate newly discovered evidence unearthed on the first and second days of trial. Third, he argues that the trial court erred in denying his motion for a directed verdict at the close of all the evidence. We address these arguments in turn.

### A.

Wilson was arrested in Tampa, Florida on March 1, 1984. He was informed of his *Miranda* rights and signed a form waiving these rights. He then told the FBI that he was unaware that he had been involved in a crime. In this first statement, Wilson stated that at all times he believed that he was engaged in a sting operation against drug dealers. He admitted that, with Wright and Enriquez, he carried out a plan to "rip off" a teacher who sold drugs at the school where she worked. He denied any knowledge that Mrs. Dontrich was a bank manager. Wright and Enriquez, he claimed, told him that law enforcement authorities approved of the plan because they lacked sufficient evidence to proceed legally against the drug dealers. Wilson admitted that, following this plan, he staked out the Dontrichs' home and noted that a small boy and girl played in the yard. Wilson also admitted that he refrained from asking too many questions because he felt the others were lying to him.

Wilson admitted that he drove Wright and Enriquez to the Dontrich home in his

brown 1982 Buick Electra at about 10:00 p.m. in the evening. He stated that Enriquez was armed with a MAC 10, a .45 automatic weapon. After they entered the house, he waited down the street "for signs of a rescue mission" and then left the area. He returned at approximately 5:00 a.m. and picked up Wright. Later that morning he met Enriquez at a pre-arranged point and followed him in his car to St. Louis. They then drove from St. Louis to Tampa, Florida in Wilson's car. Wilson stated that he was to receive a minimum of $3,000 for his efforts. He received only $1,800 and in explanation was told that the mission was incomplete.

Wilson was arraigned after this interrogation, taken to Manatee County, Florida, and held overnight in a drunk tank. Wilson claims that during the night he suffered severe pains in his side. He was examined by a nurse who recorded his blood pressure as elevated. He also claims that he felt isolated because he was jailed some distance from his home. FBI agent Ramey questioned him again the following day. After this second period of interrogation Wilson gave a second statement in which he admitted that he knew that they had conducted surveillance of a bank manager's house and that she would be taken hostage in a planned August 19th robbery of the State Bank of DeSoto. He admitted that his role was to scout the home, drive Wright and Enriquez there, return for Wright early Friday morning, and to pick Enriquez up after the robbery. He also admitted of knowing that guns and a fake bomb would be used.

Wilson claims that during this second interrogation Ramey called him a liar, and told him that in his prior statement he had implicated himself in a number of state crimes. Wilson also claims that Ramey told him Wright had implicated him in the hostage-taking and robbery. Ramey, he claims, threatened that he would be subject to trial in state court and possibly faced a multiple life sentence. He also claims that Ramey implied that he would receive more lenient treatment if he confessed to the federal offenses and was prosecuted in a

federal court. Wilson contends that his will was overborne through Ramey's interrogation techniques and that his second statement was involuntary. He contends also that the second statement was a composite created by Ramey and that he signed it without having read it carefully.

Ramey denied telling Wilson that he would be treated more fairly in federal court, and that Wright had implicated Wilson in the Bank of DeSoto robbery. He also denied telling Wilson that he faced several life sentences. Ramey admitted, however, of telling Wilson that he felt Wilson had been untruthful in his first statement, and that his first statement admitted to several state crimes.

Magistrate Noce conducted a pre-trial hearing to determine whether to suppress Wilson's statements and concluded that the record does not support Wilson's assertion that he was threatened or coerced into making his statements. *United States v. Wilson*, No. 84–60Cr(1), slip op. at 5 (E.D.Mo. May 14, 1984). The Magistrate found that Wilson was properly advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), that he at no time requested an attorney, and that he knowingly and voluntarily waived these rights. *Id.* The Magistrate also found that no threats or promises were made to coerce Wilson to confess, and that the police complied with Wilson's request that they notify his employer and his girl friend of his whereabouts. *Id.* at 6. The district court, on the basis of these findings, denied Wilson's motion for suppression. Wilson urges us to conclude that this decision was erroneous.

 The voluntariness of a confession is a legal inquiry subject to plenary review by the appellate courts. *Miller v. Fenton*, — U.S. ——, 106 S.Ct. 445, 452, 88 L.Ed.2d 405 (1985). In determining whether a confession was voluntary we must examine the entire record for evidence that the statement was given under such circumstances which would indicate that the defendant was coerced or his will over-

borne. *Davis v. North Carolina,* 384 U.S. 737, 742, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966); *see also Rachlin v. United States,* 723 F.2d 1373, 1377 (8th Cir.1983). In this analysis the court employs a flexible totality of the circumstances approach, considering the specific interrogation tactics employed, the details of the interrogation, and the characteristics of the accused. *Rachlin,* 723 F.2d at 1377. This flexible standard allows for judicial determination of voluntariness "in myriad situations without being hampered by rigid and potentially artificial restraints." *United States v. Grant,* 622 F.2d 308, 316–17 (8th Cir.1980).

■ After careful consideration of the circumstances, we conclude that Wilson's statements were voluntary. First, he was informed of his rights and does not dispute that he knowingly waived them. Second, Wilson is a mentally competent adult with a high school education. He served in the United States Army for twenty-two years and was honorably discharged. There is no evidence in the record to indicate that he was unusually susceptible to pressure. Third, in determining that the agent made no promise of lenience, Magistrate Noce resolved the credibility dispute in the government's favor and the record does not show that this was erroneous. Fourth, the short interrogation sessions, the fact that Wilson was in no physical discomfort at the time of interrogation,[5] and the fact that the agents notified those who Wilson requested to be notified of his whereabouts, all indicate that the circumstances of the interrogation were not unduly oppressive. Finally, viewing the circumstances as a whole, we do not believe that, as a result of being told that his first confession implicated him in state crimes, Wilson's will was overborne and his confession coerced. *Cf. Compare Johnson v. Hall,* 605 F.2d 577, 582 (1st Cir.1979) (the fact that agents confronted defendant with incriminating evidence does not amount to coercion). We therefore hold that the statements were

voluntary and properly admitted into evidence.

**B.**

Wilson argues that the trial court erred in denying his motion for a directed verdict at the close of all the evidence because there was insufficient evidence on which to submit the case to a jury.

An appellate court reviewing the sufficiency of the evidence to support a conviction must view the evidence in the light most favorable to the verdict, accepting all reasonable inferences that logically arise from this evidence. *United States v. Nabors,* 762 F.2d 642, 652 (8th Cir.1985); *Durns v. United States,* 562 F.2d 542, 545–46 (8th Cir.), *cert. denied,* 434 U.S. 959, 98 S.Ct. 490, 54 L.Ed.2d 319 (1977). The evidence need not "exclude every other hypothesis except that of guilt [so long as it is] sufficient to convince the jury beyond a reasonable doubt that the defendant is guilty." *United States v. Shahane,* 517 F.2d 1173, 1177 (8th Cir.), *cert. denied,* 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 124 (1975).

■ Wilson's insufficiency claim loses almost all its force in light of our decision above that his confession was properly admitted into evidence. The confession, and Wright's testimony directly linking Wilson to the hostage-taking and robbery, implicates Wilson on all the elements of the offense charged. We conclude that there was sufficient evidence to convince a jury of his guilt beyond a reasonable doubt.

**C.**

■ On the first day of Wilson's trial, the government turned over an FBI file which contained, among other things, a memorandum which stated that the Dontrichs had selected from a photo-spread a third person as resembling the unmasked robber. On the second day of trial, the government gave Wilson's counsel a copy

---

**5.** While Wilson contends that he suffered "excruciating pain" in his side during the night, he does not state that these pains continued during

his interrogation session the following afternoon. Tr. IV–108[W].

of a handwritten note by an FBI agent, a security log kept by Mrs. Dontrich in her capacity as a bank manager, in which she noted that a Bob Blackwell[6] and Henry Enriquez were at her bank prior to the robbery, and accounts of an in-person line-up, and a voice lineup. Wilson does not contend that the government improperly withheld this information until the day of trial. On both days Wilson's counsel requested a continuance to evaluate the new evidence. The judge in both instances, after hearing argument on the issue, denied the motion.

The district court has broad discretion over motions for continuance. We will not reverse the denial of such a motion unless there is a clear abuse of the district court's discretion. *United States v. Reeves,* 730 F.2d 1189, 1193 (8th Cir.1984). In denying the motions for continuance, the district court found that Wilson would have sufficient opportunity during the trial to assess the new identification evidence and prepare an appropriate response. Tr. I-5[W].[7] The court found that the other evidence disclosed did not involve matters which necessitated a delay for further investigation. *Id.*

The record shows that Wilson's attorney had full opportunity to cross-examine the witnesses concerning the new evidence and that he took advantage of this opportunity. He has not pointed to additional favorable evidence which he might have developed had he been granted the continuance. We conclude that the district court did not abuse its discretion in denying the motions.

## II. *Henry Enriquez*

Enriquez raises six arguments for reversal or modification of his conviction. Again, we deal with each in turn.

### A.

Enriquez argues that the trial court abused its discretion when it sentenced him to a term of fifty years. He maintains that the sentence exceeded the maximum sentence as calculated based on the Board of Probation and Parole pre-sentence report, and exceeded sentences ordered for the same or similar violations in this and other jurisdictions. He urges us to overturn this sentence as disproportionate to the offense charged and therefore in violation of the eighth amendment.

The Supreme Court has recognized that the Eighth Amendment to the United States Constitution proscribes as cruel and unusual, punishment that is grossly disproportionate to the severity of the offense. *Solem v. Helm,* 463 U.S. 277, 290 n. 17, 103 S.Ct. 3001, 3010 n. 17, 77 L.Ed.2d 637 (1983); *Ingraham v. Wright,* 430 U.S. 651, 667, 97 S.Ct. 1401, 1410, 51 L.Ed.2d 711 (1977). This ruling does not, however, authorize courts to indiscriminately reassess sentences authorized by the legislature and administered by the trial court. The Court specifically noted that "in view of the substantial deference that must be accorded legislatures and sentencing courts, a reviewing court rarely will be required to engage in extended analysis to determine that a sentence is not constitutionally disproportionate." *Solem* 463 U.S. at 290 n. 16, 103 S.Ct. at 3009 n. 16. *See also United States v. Rosandich,* 729 F.2d 1512, 1512 (8th Cir.1984) (a sentence generally is not subject to review unless it exceeds statutory limits, violates constitutional or procedural requirements, or shows that the district court manifestly or grossly abused its discretion.) The standard imposed is a high one. As the Court indicated in *Solem,* "outside of the context of capital punishment, successful challenges to the proportionality of particular sentences [will be] exceedingly rare." *Solem,* 463 U.S. at 289, 103 S.Ct. at 3009. *See generally* Jeffries & Stephan, *Defenses, Presumptions, and Burden of Proof in the Criminal Law,* 88

---

6. Bob Blackwell was a student in Enriquez's karate class and a member of his survival training group. He also operated a locksmith business in which Henry Enriquez served as an apprentice. Tr. V-4[E].

7. The Court indicated that trial would be recessed early on that day so that appellant's counsel could further evaluate the evidence. Tr. I-5[W].

Yale L.J. 1325, 1379 (1979) ("only in the extreme case of a penalty so grossly disproportionate and excessive as to defy rational judgment could the punishment be found cruel and unusual * * *.")

The Supreme Court in *Solem* articulated a three step analysis by which to conduct sentence proportionality review. These objective factors, while not exclusive, provide guidelines for our analysis. The three factors are: (1) the gravity of the offense and the harshness of the penalty; (2) comparison of sentences imposed in the same jurisdiction; and (3) comparison of sentences imposed on criminals in other jurisdictions. *Solem*, 463 U.S. at 290–291, 103 S.Ct. at 3010. We take these factors in turn.

The fifty-year sentence imposed in this case is a severe penalty. The crime which Enriquez committed, however, was grave. Enriquez and his accomplice entered the Dontrich home, held the family hostage overnight at gunpoint, and in the morning, forced Mrs. Dontrich to take him to the State Bank of DeSoto, which he then robbed. He was armed at all times with a deadly weapon and, although no actual physical harm was inflicted, there was a continuing and significant risk of violence. We note particularly the fact that the Dontrichs' two young children were present and at risk throughout this ordeal. Mrs. Dontrich was forced to bind her young children and leave them, along with her husband, in a house which she had been led to believe contained a remote-controlled bomb. The reign of terror continued for approximately eight hours. The sentencing judge specifically noted that the Dontrich family suffered severe emotional distress as a result of the trauma.

We do not deal here with a passive offense. The scheme involved surveillance of the Dontrichs' home and monitoring of their activities. These premediated acts are not lightly regarded by this society. The statute sets a ten-year minimum sentence for a section 2113(e) violation. We think it reasonable to conclude that the legislature employed a minimum sentence approach for this subsection of the statute in order to leave the district courts broad discretion in dealing with a particularly serious offense. The fifty-year sentence imposed in this case is within this broad discretion.

The second factor, relationship of the challenged sentence to sentences imposed for the same or similar crimes in the same jurisdiction, does not support Enriquez's disproportionality argument. We think in this case it is proper to place our emphasis on convictions involving offenses under subsection 2113(e).[8] The appellant cites to only one such case—the fifteen-year sentence imposed on Wilson. Wilson, however, played a discernibly smaller role in this offense than did Enriquez. He did not enter the Dontrich home or the bank. He did not bear the weapons involved in the offense, nor did he assume the leadership role which was attributed to Enriquez.[9] The court was entitled to consider these individual factors in determining the severity of Enriquez's punishment.

---

**8.** Appellant brings to our attention a number of convictions under various other subsections of section 2113. 18 U.S.C. Section 2113(a) carries a maximum penalty of twenty years and a $5000 fine. Subsections (b) and (c) carry maximum penalties of ten years and a $5,000 fine. Subsection (d) carries a maximum penalty of twenty-five years and a $10,000 fine. By focusing on convictions which involve these subsections of section 2113, and which do not include a subsection (e) violation, the appellant targets cases which have legislatively imposed lower sentences. While each subsection of § 2113 states a separate offense, convictions under multiple subsections merge for sentencing purposes.

*Bryan v. United States*, 721 F.2d 572, 575 (6th Cir.1983), *cert. denied*, 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 711 (1984). Because appellants' conviction includes a § 2113(e) offense, that subsection places an outer limit on the penalty which may be imposed. We therefore exclude from our analysis cases not involving a subsection 2113(e) violation.

**9.** Wright testified that Enriquez planned the robbery. Tr. I–14[W]. Both John and Barbara Dontrich testified that he issued the orders and did all the talking inside the home. Tr. II–104[E]; Tr. III–29[E].

In considering the third factor, we accept appellant's designation of all federal courts as "other jurisdictions." The defendant provides a list of section 2113(e) sentences in other United States district courts for the years 1979 to 1982, inclusive. Focusing only on those in which no homicide was committed, we encounter fifteen cases, in five of which the sentence imposed exceeded forty years. In three of these cases the court imposed a forty-five year sentence. Further, our research reveals two additional post 1982 cases. In one, a forty-year sentence was imposed. *United States v. Moore*, 710 F.2d 270 (6th Cir.), *cert. denied*, 464 U.S. 997, 104 S.Ct. 497, 78 L.Ed.2d 690 (1983). In the other, a fifty-year sentence was upheld on appeal for a section 2113(e) violation. *United States v. Whitley*, 759 F.2d 327 (4th Cir.), *cert. denied*, — U.S. ——, 106 S.Ct. 196, 88 L.Ed.2d 164 (1985). We are amply cognizant of the fact that mere recitation of the numbers involved in sentences imposed on the basis of disparate facts is a superficial and perhaps largely inadequate way in which to analyze the disproportionality of a sentence. However, in the absence of specific details on the factors giving rise to these sentences, this inquiry remains a useful tool for fixing the range of sentences for a particular offense. The fifty-year term involved here is not so grossly disproportionate to other sentences under the same subsection as to be unconstitutional.

The appellant stresses his previously clean criminal record. While the absence of prior criminal convictions is a factor which the sentencing court may, in its discretion, consider, the fact that appellant was making his first appearance before the court does not carry the weight for which he argues. The deliberate and premeditated nature of the offense, the strong potential for violence involved, and the wanton invasion of the victim's home, weigh heavily against any lenience which may attach to Enriquez's status as a first offender. We also note that the Board of Probation and Parole's report does not bind the sentencing court's determination of the appropriate sentence. *See e.g., United States v.*

*Roberts,* 676 F.2d 1185, 1187, 1189 (8th Cir.), *cert. denied,* 459 U.S. 855, 103 S.Ct. 122, 74 L.Ed.2d 106 (1982) (sentence not invalid because court did not emphasize salient factors in presentence investigation report). Thus the fact that the court imposed a sentence in excess of the one calculated on the basis of the report, without more, is not evidence of an abuse of discretion.

Enriquez argues that the significantly lighter sentences imposed on Wright and Wilson indicate that his sentence was disproportionate. This argument is without merit. One accomplice cooperated with law enforcement authorities and was not charged with this offense. Enriquez has no legitimate claim to similar treatment. The other, as we discussed above, played a less prominent role in the robbery. It is within the sentencing judge's discretion to impose disparate sentences on co-defendants. *See, e.g., United States v. Chiago,* 699 F.2d 1012 (9th Cir.), *cert. denied,* 464 U.S. 854, 104 S.Ct. 171, 78 L.Ed.2d 154; *United States v. Castillo-Roman,* 774 F.2d 1280, 1284 (5th Cir.1985). Enriquez was apparently the central character in the kidnapping and robbery. The court could, in its discretion, determine that he was deserving of a more severe sentence.

Finally, *Solem* recognizes eligibility for parole as a relevant factor in determining whether a sentence is disproportionate. Enriquez, under 18 U.S.C. § 4205(a) (1982), will be eligible for parole consideration after serving ten years of his sentence. For the foregoing reasons, we conclude that the term of fifty years imposed on Enriquez was not grossly disproportionate to the severity of the offense.

### B.

Barbara and John Dontrich and Doris Arnold, after viewing a photo-display, identified Enriquez as one of the two intruders who entered the Dontrich's home and robbed the State Bank of DeSoto. Appellant charges as error the trial court's failure to suppress the photo-identification tes-

timony. He argues that the identification procedure was impermissibly suggestive because the photo-display did not contain any photograph of Hispanics other than Enriquez. He further argues that John and Barbara Dontrich and Doris Arnold's in-court identification was tainted by the impermissibly suggestive identification procedure.

■ An identification procedure may violate due process where, under the circumstances, the procedure creates a "very substantial likelihood of irreparable misidentification." *Neil v. Biggers*, 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972) (citing, *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968)).

■ We first address whether, under the circumstances, the identification procedure was unnecessarily suggestive because Enriquez was the only Hispanic person included in the display. Our examination of the black and white photo-spread reveals that all five persons depicted were similar to each other and to the general descriptions given to the police. Mr. and Mrs. Dontrich and Ms. Arnold stressed that their assailant was somewhat dark to olive skinned, had dark hair, and was somewhat stocky. Enriquez's photograph was not markedly distinct from the others. In fact, there was considerable similarity of hair color, style, general physical build, and skin tone. A photo-spread displaying persons of markedly different race or ethnicity may be unduly suggestive.[10] We are not inclined, however, to conclude that in the absence of differences in appearance tending to isolate the accused's photograph, an identification procedure is unnecessarily suggestive solely because the display did not depict persons of the same race or ethnic group.[11]

■ Further, even had we concluded that the photo-identification procedure was unnecessarily suggestive, we would not suppress the witnesses' testimony as to the photographic identification unless it lacked a sufficient basis for reliability. *See Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. at 199, 93 S.Ct. at 382. In evaluating the reliability of identification testimony, we will weigh such key factors as the witness' opportunity to view the criminal, the witness' degree of attention, the accuracy of prior descriptions, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation. *Neil*, 409 U.S. at 199, 93 S.Ct. at 382; *Brathwaite*, 432 U.S. at 114, 97 S.Ct. at 2253.

Enriquez argues that the witnesses' identification testimony was unreliable because, immediately after the DeSoto bank robbery, John and Barbara Dontrich told federal officials that they doubted their ability to identify the robber. The witnesses also failed to state with absolute conviction that Enriquez was the unmasked intruder.

---

**10.** The appellant brings *Martinez v. Turner*, 461 F.2d 261 (10th Cir.1972) to our attention. In that case the Tenth Circuit examined a photo-spread in which only one of five individuals, other than the suspect, looked Mexican. The victims had identified their assailant as Mexican and the only other individual meeting that description was noticeably taller and slighter in build than the defendant. Under those circumstances, the court concluded that the absence of other Mexicans was a suggestive factor. *Id.* at 264. Our case is distinguishable from *Martinez* because the persons in the photo-spread had general physical characteristics compatible with Enriquez's appearance.

**11.** Given our conclusion, we may summarily dispose of Enriquez's contention that the Dontrichs' and Ms. Arnold's in-court identification was tainted by an unnecessarily suggestive photo-identification procedure.

We also conclude that the record does not support Enriquez's contention that the method in which the photographs were presented was unnecessarily suggestive. He provides no support for this contention. The record shows that the photographs were simultaneously displayed. Further, the witnesses separately viewed the photographs and had no opportunity to discuss their perceptions before making a decision. Finally, there is no evidence that they were pressured or led toward a particular selection. We therefore reject this contention. *United States v. Thompson*, 730 F.2d 82 (8th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 443, 83 L.Ed.2d 369 (1984).

Applying the *Neil* factors, we conclude that the identifications had a sufficient basis for reliability and were properly admitted. The witnesses all had an opportunity to observe Enriquez. Mr. Dontrich testified that he saw Enriquez briefly at the door, and later was able to discern his general features and outline by the light from the children's bedroom closet. Mrs. Dontrich testified that she saw parts of the intruder's face as he handcuffed her husband on the bedroom floor, and again as he stood by her when she made a telephone call. She also had an opportunity to observe him in the morning as she waited in the living room before being forced to drive to the bank, and finally while she was in the bank. Doris Arnold had an opportunity to observe the robber while Mrs. Dontrich placed the money in his briefcase.

In addition, all three witnesses selected Enriquez's photograph without hesitation as similar to the man who committed the robbery.[12] The record shows that Mr. and Mrs. Dontrich identified a third person as resembling the man who invaded their home. They both, however, declined to identify him as the robber in a subsequent lineup. At trial, they testified that their selection was intended to indicate the person in that photo-display closest in appearance to the unmasked intruder, not as an absolute identification of that person as the intruder. Tr. II–167, 168; Tr. III–74, 75[E].

Finally, even weighing the fact that more than four months had passed before these witnesses identified Enriquez, we still conclude that the identification testimony had a sufficient basis for reliability and was therefore admissible. We do not believe that under all the circumstances of this case there was "a very substantial likelihood of irreparable misidentification." *Brathwaite,* 432 U.S. at 116, 97 S.Ct. at 2254. Short of this point, the evidence is for the jury to weigh. *Id.*

## C.

Enriquez next contends that the district court improperly limited the scope of his examination of the government's "star" witness, Michael Wright. He sets forth three avenues of cross-examination curtailed by the court which he considered necessary to fully set before the jury his theory of the case. First, he argues that he should have been allowed to ask Wright on cross-examination whether his girl friend's mother owned a Camaro. Second, he argues that he should have been allowed to ask whether Enriquez had ever stolen from Wright money which Wright had given him to purchase drugs in Mexico. Third, he protests the court's refusal to allow him to ask on cross-examination where Wright would be incarcerated on a separate felony conviction.

The sixth amendment guarantees a defendant's right to fully and adequately cross-examine the witnesses against him. *Davis v. Alaska,* 415 U.S. 308, 315, 94 S.Ct. 1105, 1109, 39 L.Ed.2d 347 (1974). In ensuring that a defendant has an opportunity for meaningful cross-examination, courts permit wide latitude in the scope of cross-examination of government witnesses about matters relevant to credibility or bias. *See United States v. Mansaw,* 714 F.2d 785, 789 (8th Cir.), *cert. denied,* 464 U.S. 964, 104 S.Ct. 403, 78 L.Ed.2d 343 (1983). The trial court, however, retains the discretion to limit cross-examination beyond that necessary to satisfy the sixth amendment. *United States v. Siegel,* 587 F.2d 721, 727 (5th Cir.1979); *see also United States v. McLernon,* 746 F.2d 1098, 1116 (6th Cir.1984) (the court has broad discretion to limit cumulative harassing or irrelevant questioning). In determining whether the trial court abused its discretion in limiting appellant's cross-examination of Wright, we focus on the nexus between the information sought and the purpose of the cross-examination, the relevancy of the in-

---

**12.** Barbara Dontrich stated, when she selected Enriquez's photo from the display, that she was not sure if she remembered him from the robbery, or from his having been to the bank previ-

ously to change a lock. Tr. III–84[E]. This information, to the extent that it bore on the soundness of her identification, was fully presented to the jury.

formation, and the availability of other opportunities to elicit the information. *See, Mansaw,* 714 F.2d at 788–89.

Enriquez asserts that the trial court improperly limited the scope of cross-examination when it denied him the opportunity to inquire of Wright whether his girl friend's mother owned a Camaro. He argued that this inquiry was relevant to the case because it was known that Wright had previously used his girl friend's car in another robbery. He also stated that Wright's girl friend's mother owned a Camaro. He maintained that Mr. Dontrich had stated that he thought the car he saw in his driveway during the robbery was a Camaro or a Firebird.[13] Enriquez sought to establish that Wright could have used his girl friend's mother's car in the State Bank of DeSoto robbery and then falsely implicated Enriquez in order to protect them. Thus, he argued, the inquiry was relevant to motive. The district court sustained the objection to this line of inquiry because the linkage which Enriquez's counsel sought to establish involved too many circumstances that would require explanation and had minimal probative value. Tr. II–6[E].

We agree with the district court's assessment that the linkage which Enriquez's counsel sought to establish was hazy at best. Further, he had sufficient opportunity to pursue Wright's motive and bias in other cross-examination. For example, counsel questioned Wright on whether his girl friend owned a Camaro or a Firebird. He also explored the fact that Wright's plea agreement protected no one other than himself and intimated in closing argument that Wright was lying to protect close friends. Tr. II–26[E]. He therefore suffered no violation of his sixth amendment right due to this restriction of cross-examination.

Enriquez also claims that the trial court improperly restricted his ability to cross-examine Wright concerning an alleged drug purchase plan involving Enriquez. In a previous trial on a separate robbery charge Enriquez had testified that Wright gave him money to buy drugs in Mexico. Enriquez admitted to stealing the money and stated that Wright had promised to get even. In that trial, Wright was questioned regarding this transaction. He denied giving Enriquez money and invoked his fifth amendment right against self-incrimination in response to further questions. In this trial Enriquez sought, again, to ask Wright whether he had given Enriquez money to buy drugs. He sought to show that Wright was biased against Enriquez because he believed that Enriquez had stolen his money. Enriquez had not, at that point, testified in his own behalf.[14]

The trial court denied Enriquez's counsel the opportunity to cross-examine Wright about this alleged drug transaction. Appellant was allowed, however, to inquire of Wright whether Enriquez had ever stolen money from him. The court concluded that this was sufficient basis from which to determine bias. Wright denied having given any money to Enriquez and the court precluded further questioning in this area. We hold that the district court did not abuse its discretion.

Finally, Enriquez argues that the trial court abused its discretion by refusing to allow him to ask Wright where he would be incarcerated pursuant to his plea bargain agreement. The court reasoned that this may reveal information concerning the Federal Witness Protection Program. The court might well have limited questioning, as it did on other points, to minimize this risk without completely disallowing the question. Nonetheless, we conclude that

---

**13.** Wilson stated in his confession that he used a brown 1982 Buick Electra in the robbery, a fairly large car. The record reveals that John Dontrich stated that he thought he saw a smaller car. Tr. II–150[E]; 11–171[W].

**14.** Enriquez subsequently took the stand and testified to the above alleged transaction. The prosecution did not call Wright to rebut Enriquez's assertion. In his closing argument, Enriquez's counsel stressed this failed drug transaction as Wright's motive for false testimony. Tr. VI–37, 38[E].

suppression of this inquiry could not have significantly impaired appellant's ability to develop his case. Appellant had ample opportunity to question Wright regarding possible bias and interest and to impeach the motives for his testimony. Therefore, he suffered no violation of his sixth amendment rights. We conclude therefore that, even if the district court erred in suppressing all cross-examination on this point, the error involved did not affect a substantial right. *See* Fed.R.Evid. 103(a).

**D.**

Enriquez next contends that the trial court erred in refusing to order the government to turn over, pursuant to the Jencks Act, 18 U.S.C. § 3500 (1982), a report prepared by FBI agent Ramey. The report was prepared subsequent to appellant's arrest and allegedly contained statements given to Ramey by appellant's wife, Pam Enriquez, and his mother-in-law, Jeanne Perry.

The district judge ruled that the statements in the report were not the statements of a witness because neither Pam Enriquez nor Jeanne Perry had been called as a witness for the government. On appeal Enriquez argues that the statements were producible because they were Ramey's statements and were clearly within the 18 U.S.C. § 3500(e) (1982) definition of "statement." [15]

Appellant's analysis fails whether we regard the statements as agent Ramey's or as the statements of Jeanne Perry and Pam Enriquez.[16] If, in fact, he believes the report contained Ramey's statements, he must demonstrate that these statements "relate to the subject matter as to which the witness has testified." *Id.* § 3500(b). *See, e.g., United States v. Gaston,* 608 F.2d 607, 611 (5th Cir.1979); *United States v. Nickell,* 552 F.2d 684, 687–88 (6th Cir. 1977), *cert. denied,* 436 U.S. 904, 98 S.Ct. 2233, 56 L.Ed.2d 402 (1978).

The district court considered the substance of Ramey's direct testimony. It also considered Enriquez's contention that the information in the statements, which he specifically targeted, were Jeanne Perry and Pam Enriquez's statements concerning his whereabouts around the time of the robbery. Ramey did not testify to these statements. Ramey testified to the circumstances of Enriquez's arrest and his physical appearance at that time. Those relevant portions of his report dealing with this subject were, in fact, disclosed. Since the other portions of the report did not relate to the subject matter of his direct testimony, the Jencks Act does not require that the government produce them. The trial court's decision therefore, was not erroneous.

Appellant also contends that Pam Enriquez and Jeanne Perry's statements as to his whereabouts on the date of the robbery "would be necessarily favorable evidence", Brief for Appellant at 37, which must be disclosed under *Brady v. Mary-*

**15.** The Jencks Act provides in relevant part:
(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.
\* \* \* \* \* \*
(e) The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;
(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or
(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

**16.** In the latter instance, the district court's ruling was clearly correct since neither Pam Enriquez nor Jeanne Perry was a witness for the United States.

*land,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This argument is decidedly without merit since appellant called Pam Enriquez as a witness and she testified extensively in his favor concerning his whereabouts around the date of the robbery. The government is under no obligation to disclose to the defendant that which he already knows. *See United States v. Young,* 618 F.2d 1281, 1287 (8th Cir.), *cert. denied,* 449 U.S. 844, 101 S.Ct. 126, 66 L.Ed.2d 52 (1980); *United States v. Steffen,* 641 F.2d 591, 594 (8th Cir.), *cert. denied,* 452 U.S. 943, 101 S.Ct. 3091, 69 L.Ed.2d 959 (1981). Appellant's mother-in-law likewise was available to him as a witness.

### E.

■ Enriquez's remaining arguments need not detain us long. First, we reject his argument that the district court improperly admitted into evidence a photograph showing Enriquez in military camouflage dress and carrying a rifle. He argues that the photograph was irrelevant to any issue in the case or, alternatively, that if relevant it should be excluded under Federal Rule of Evidence 403. The trial judge has broad discretion in determining the relevance of a given item of evidence. *United States v. Williams,* 545 F.2d 47, 50 (8th Cir.1976). The photograph was admitted into evidence after Wright was cross-examined regarding a survivalist training camp which Enriquez operated. The trial court concluded that the information tended to confirm the relationship between Enriquez, Wright, and other individuals named throughout the trial. We do not believe that the photograph was so unfairly prejudicial as to render its admission an abuse of discretion.

■ Enriquez also contends that the trial court improperly admitted into evidence a corduroy jacket and trousers, a fake beard, glue, and gloves, which were found discarded approximately twenty miles from the State Bank of DeSoto on the date of the robbery. Enriquez argues that, while the items might otherwise be relevant, they were rendered irrelevant and inadmissible because the prosecutor failed to establish a proper foundation for their admission. Specifically, he argues that no evidence was adduced tying these objects to Enriquez.

John and Barbara Dontrich and Ms. Arnold testified that the robber wore a tan corduroy suit. They testified that he also wore a false beard. Barbara Dontrich testified that, at some points, the robber wore gloves. The district court, in its discretion, determined that this was a sufficient foundation. These items of evidence tend to corroborate the testimony regarding the robber's appearance. The district court did not abuse its discretion in admitting them.

■ Finally, we reject Enriquez's argument that the trial court erred in denying his motion for mistrial on the basis of the prosecution's closing argument in which he referred to his opponent as a "magician" performing "sleight of hand" in defense of his client. Tr. VI–60, 61[E]. The district court has broad discretion in controlling closing arguments. *United States v. Lavallie,* 666 F.2d 1218, 1222 (8th Cir.1981); *United States v. Bohr,* 581 F.2d 1294, 1301 (8th Cir.) *cert. denied,* 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978). The statement, while perhaps over zealous, was not so prejudicial or inflammatory as to affect the jury's ability to fairly decide the case and thus deprive Enriquez of his right to a fair trial. *See United States v. Robinson,* 539 F.2d 1181, 1185 (8th Cir.1976), *cert. denied,* 429 U.S. 1101, 97 S.Ct. 1124, 51 L.Ed.2d 550 (1977). We therefore affirm the district court's denial of appellant's motion for mistrial.

In conclusion, we confirm the convictions of Lawrence A. Wilson and Henry Francis Enriquez in all respects.