UNITED STATES of America, Appellee,

v.

Norman Bernard THIRION a/k/a Norman Tyrone a/k/a Dr. Thirion, Appellant.

UNITED STATES of America, Appellee,

v.

Ronald A. SABLOSKY, Appellant.

UNITED STATES of America, Appellee,

v.

Jack CASPERSON, Appellant.

Nos. 86-5026 to 86-5028.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 10, 1986.

Decided March 5, 1987.

148

Roger Wayne Hunt, Sioux Falls, S.D., for Thirion.

Patrick J. Kane, Sioux Falls, S.D., for Sablosky.

Richard Braithwaite, Sioux Falls, S.D., for Casperson.

David L. Zuercher, Asst. U.S. Atty., Pierre, S.D., for appellee.

Before McMILLIAN, Circuit Judge, HENLEY, Senior Circuit Judge, and HUNTER, Senior District Judge.*

* The Honorable Elmo B. Hunter, United States Senior District Judge, Eastern District of Mis- souri, sitting by designation.

HENLEY, Senior Circuit Judge.

Defendants Norman Bernard Thirion, Ronald A. Sablosky and Jack Casperson appeal from their convictions for their parts in an advance-fee loan scheme. A jury found Thirion guilty on four counts of mail fraud, 18 U.S.C. § 1341, nine counts of inducing interstate travel to defraud, 18 U.S.C. § 2314, and three counts of wire fraud, 18 U.S.C. § 1343. The district court[1] sentenced Thirion to seven concurrent five-year terms of imprisonment followed by a five-year period of probation on the remaining counts. Thirion was also ordered to make restitution of $330,000.00. Casperson was convicted on the same counts as Thirion, with an additional conspiracy conviction under 18 U.S.C. § 371. Casperson was sentenced to eight concurrent thirteen-month terms of imprisonment followed by a five-year period of probation on the remaining counts. He was also ordered to make restitution of $10,000.00. Sablosky was convicted of one count of conspiracy and one count of mail fraud. He was acquitted by the jury of the remaining six counts against him (three for mail fraud and three for wire fraud). Sablosky was sentenced to one year of imprisonment on the conspiracy conviction followed by a five-year term of probation on his mail fraud conviction.

The defendants raise numerous, sometimes overlapping, issues on appeal. This court previously overturned the convictions of defendants Casperson and Sablosky and this is the second time they have been tried for these offenses. *United States v. Casperson*, 773 F.2d 216 (8th Cir.1985). Thirion was not a defendant in the first trial as he had secreted himself outside the United States. Only defendant Sablosky challenges the sufficiency of the evidence to sustain his conviction. Accordingly, we will limit our factual discussion to providing a background for the issues preserved in the appeals now before us.[2]

## I.

In January, 1982 Casperson first met Thirion in Newport Beach, California. At that time Casperson was seeking financial backing for a business venture he was interested in pursuing. Thirion indicated that he could obtain a low interest block loan of $250 million from overseas sources. In order to secure the loan, however, Thirion required an advance fee of $160,000.00 to cover costs and expenses.

Casperson, however, did not then possess financial resources from which he could readily pay the advance fee. He therefore set out to attract other investors interested in low interest loans in order to raise the advance fee. Investors were to pay an advance fee of $20,000.00 for a $1 million loan. The loan was to be obtained in six to eight weeks at which time the investor would receive a refund of his advance fee together with the loan. Casperson further guaranteed the return of the investor's advance fee by a commission he was to receive from another venture involving the sale of Mexican tuna fish.

By April, Casperson had collected over $400,000.00 in advance fees from investors. This money was forwarded to Thirion's company, International Banking Services (IBS). Although the loans were originally to be forthcoming by the end of April, that date passed with no results. The investors were placated by numerous plausible excuses given for the delay.

Meanwhile, defendant Sablosky (corporate counsel for IBS) was in Hawaii on behalf of another Thirion corporation, United States Resource Conversion Systems (USRCS).[3] During the month of May Sablosky became aware of the advance-fee loan transactions. Sablosky determined

1. The Honorable John B. Jones, United States District Judge, District of South Dakota.

2. We have carefully reviewed the trial record together with the briefs of the parties and our previous decision. We observe that, in the main, there is little dispute with our prior factual summary. *See Casperson*, 773 F.2d at 217–20.

Rather, disputes tend to center on inferences drawn or to be drawn from the basic facts.

3. USRCS was a development stage corporation which was attempting to interest local governments in building waste-to-energy plants in their communities.

that the tuna fish commissions were of speculative value; in any event, the advance fees paid by the investors exceeded the maximum possible value of the commission.

On May 25, 1982 Sablosky had Casperson execute promissory notes in favor of each investor for the amount of the advance fee paid by each investor. The promissory notes were payable on September 15, 1982. Thirion, on behalf of IBS, signed a guaranty for each of Casperson's notes. In turn, Casperson assigned his tuna fish commissions to IBS. Armed with these documents, Sablosky sent letters dated June 10, 1982 (the letters were actually mailed sometime later) to each investor. Sablosky enclosed the documents with each letter and further wrote:

> I have received from I.B.S., to be held in trust in my attorney account, securities which I believe to be good and of significant value to cover all indebtedness for which I.B.S. has seen fit to guarantee. Additionally, I have received from I.B.S. an assignment of Mr. Casperson's commissions in the Mexican Tuna sales. This assignment was in and of itself good enough consideration to induce I.B.S. to serve as guarantor.

The securities referred to were certificates of stock in USRCS, stock with no market value in a corporation with only speculative worth. The attorney account in which the securities were held in trust was a locked portion of Sablosky's desk.

On September 14, the day before Casperson's note came due, Sablosky again wrote the investors to explain why the loans continued to be delayed. Investors were further advised that they could cancel their loans and receive a refund. Investors who

responded in October did receive the refund; however, those responding later did not. IBS refunded less than $100,000.00.

Eventually, a federal grand jury began investigating the advance-fee loan arrangement. In December, 1983 the grand jury indicted nine persons including the three appellants. While Thirion did appear before the grand jury, he had left the country before the indictment was handed down. Following the first jury trial in 1984, Sablosky and Casperson were convicted on various counts of the indictment. They appealed their convictions and during the pendency of that appeal Thirion was extradited from Monaco. Sablosky and Casperson were granted a new trial as a result of their appeals and their second trial was joined with Thirion's. Upon retrial, Casperson was again convicted on all counts against him and Sablosky was convicted on only two of the remaining counts against him (Sablosky had been acquitted on several counts in the first trial). Thirion was also convicted on every count against him presented to the jury. These appeals followed.

## II.

During the pendency of Casperson and Sablosky's first appeal, Thirion was apprehended by authorities in Monaco. The United States had entered into an extradition treaty with Monaco, Treaty Respecting Extradition, Feb. 15, 1939, United States-Monaco, 54 Stat. 1780, T.S. No. 959 (hereinafter Treaty), and requested that Thirion be returned to the United States to stand trial. Monaco agreed to extradite Thirion on all the charges against him in the indictment except for the conspiracy count.[4]

---

**4.** The text of the extradition letter from the Monaco Minister of State reads in translation:

> Dear Mr. Counsul-General,
>
> Referring to your letter of April 30, 1985, I have the honor to inform you that by decision of May 31, his Sovereign Highness the Crown Prince has granted the request for the extradition of the American fugitive Norman Thirion who was placed under provisional arrest on March 30, 1985.
>
> However, conspiracy to commit a crime against the United States or to defraud the

United States is not provided for under the law of Monaco and is not included on the list of offenses giving rise to extradition under Article II of the Treaty. The request can therefore not be taken into consideration to the extent that it involves such facts. Accordingly, the extradition of Thirion is confined to the frauds which constitute violations of Sections 1341, 1343 and 2314 of Title 18 of the United States Code.

> You may wish to obtain the necessary transit authorization to cross French territory.

Prior to trial Thirion moved that the conspiracy count be dismissed as he could not be tried for conspiracy under the terms of his extradition. Thirion's motion was denied, but the district court instructed the jury not to return a verdict on that count of the indictment against Thirion. At the close of trial Thirion objected to the district court's instructing the jury on coconspirator liability under *Pinkerton v. United States*, 328 U.S. 640, 646–47, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946). The district court overruled the objection and so instructed the jury. Although these two conspiracy issues appear distinct, they are somewhat interwoven.

 Under the doctrine of speciality a defendant may be tried only for the offense for which he was delivered up by the asylum country. *United States v. Rauscher*, 119 U.S. 407, 422–23, 7 S.Ct. 234, 242, 30 L.Ed. 425 (1886); *United States v. Jetter*, 722 F.2d 371, 373 (8th Cir.1983). The doctrine is based on the principle of international comity. *Jetter*, 722 F.2d at 373. While the asylum country may consent to extradite the defendant for offenses other than those expressly enumerated in the treaty, *United States v. Najohn*, 785 F.2d 1420, 1422 (9th Cir.1986), it did not do so here. *See* n. 4, *supra*. Thirion, therefore, may raise whatever objections to his prosecution that Monaco might have. *Rauscher*, 119 U.S. at 419, 7 S.Ct. at 240.[5]

The treaty between the United States and Monaco contains the following provision:

No person surrendered ... shall be prosecuted, judged or punished for any crime or offense committed prior to his extradition, other than the offense for which his surrender was accorded, and no person shall be arrested or detained by civil process for a cause prior to the extradition, unless, in either case, he has been at liberty for one month to leave

the country, after having been tried, or, in case of conviction, after having either served his sentence or obtained pardon.

Treaty, *supra*, 54 Stat. at 1786.

 The district court correctly determined that Thirion could not be convicted on the conspiracy count. The district court, however, refused to dismiss that count of the indictment. This decision was not necessarily in conflict with the doctrine of speciality since, although Thirion could not then be convicted on the conspiracy count, the Treaty permits subsequent conviction should Thirion remain in the country after having been at liberty for one month to leave. *Id.* The more difficult question remains. While technically Thirion could not be convicted of conspiracy, the jury was instructed that he could be found guilty of the substantive counts for which he was indicted under a theory of coconspirator vicarious liability. We must consider whether this instruction was properly given when the substantive counts of the indictment charge aiding and abetting and not coconspirator vicarious liability.

 It has long been the rule in this circuit that a jury may be instructed on the theory of aiding and abetting even though not charged in the indictment. *United States v. McKnight*, 799 F.2d 443, 445 (8th Cir.1986). "The reason for this rule is that [the aiding and abetting statute, 18 U.S.C. § 2] does not create a separate offense, it simply makes those who aid and abet in a crime punishable as principals." *Id.* This reasoning is equally applicable to coconspirator liability. While Congress has recognized the conspiracy itself to be a separate crime, § 371, coconspirator liability does not have its genesis in this statute, but rather in the common law. *See Pinkerton*, 328 U.S. at 647, 66 S.Ct. at 1184 ("The rule which holds responsible one who counsels, procures, or commands another to commit a crime is founded on the same

---

**5.** The government's argument that Thirion lacked standing to complain of a violation of the treaty is without merit. The cases relied upon by the government are inapposite. *See United States v. Davis*, 767 F.2d 1025, 1029–30 (2d Cir.1985) (treaty between the United States and Switzerland used to obtain Swiss bank records expressly provided that it extended no rights to the accused); *United States v. Cordero*, 668 F.2d 32, 37–38 (1st Cir.1981) (asylum country chose to extradite in a manner other than as provided in the treaty). Neither of these situations is present here.

principle."). Therefore, the individual substantive counts need not make reference to coconspirator liability in order for the jury to be so instructed. *See United States v. Carroll,* 510 F.2d 507, 509 (2d Cir.1975), *cert. denied,* 426 U.S. 923, 96 S.Ct. 2633, 49 L.Ed.2d 378 (1976).[6] Having concluded that the indictment is sufficient, we now turn to the question whether Thirion's conviction on the substantive offenses as a *Pinkerton* coconspirator violates the doctrine of speciality.

 Our determination of whether Thirion's coconspirator convictions offend the doctrine of speciality requires further inquiry into the nature of coconspirator liability. The evidentiary effect of joining in a criminal conspiracy received early recognition. "Although conspiracy be not charged, if it be shown by the evidence to exist, the act of one or more defendants in furtherance of the common plan is in law the act of all." *Davis v. United States,* 12 F.2d 253, 257 (5th Cir.), *cert. denied,* 271 U.S. 688, 46 S.Ct. 639, 70 L.Ed. 1153 (1926). This maxim later made its way into the Supreme Court's *Pinkerton* decision. The Fifth Circuit, in affirming Pinkerton's conviction, said that in determining the defendant's guilt in the substantive offenses the jury may consider the existence of a conspiracy, "and this would be true if there

had been no conspiracy count in the indictment." *Pinkerton v. United States,* 151 F.2d 499, 500 (5th Cir.1945) (citing *Davis*), *aff'd,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *see also Nye & Nissen v. United States,* 168 F.2d 846, 853 (9th Cir. 1948) ("[T]he liability of a co-conspirator for crimes in furtherance of the conspiracy in no way depends upon the scope or existence of a conspiracy count."), *aff'd,* 336 U.S. 613, 69 S.Ct. 766, 93 L.Ed. 919 (1949). Ultimately, the Supreme Court concluded that coconspirator liability rested on much the same principle as aider and abettor liability.

> The criminal intent to do the act is established by the formation of the conspiracy. Each conspirator instigated the commission of the crime. The unlawful agreement contemplated precisely what was done. It was formed for the purpose. The act done was in execution of the enterprise. The rule which holds responsible one who counsels, procures, or commands another to commit a crime is founded on the same principle. That principle is recognized in the law of conspiracy when the overt act of one partner in crime is attributable to all.

*Pinkerton,* 328 U.S. at 647, 66 S.Ct. at 1184. The fundamental definition of a criminal offense requires the combination

---

6. Casperson and Thirion also challenge the language of the *Pinkerton* instruction given by the court. That instruction reads:

> If you find that a particular defendant is guilty of conspiracy as charged in Count I, *or is a coconspirator in the conspiracy charged in Count I,* you may also find that defendant guilty of a substantive offense as charged in any other count of the indictment, provided that you find that the essential elements of that count as defined in these instructions have been established beyond reasonable doubt, and provided that you also find beyond reasonable doubt,
>
> First, that the offense defined in the substantive count was committed pursuant to the conspiracy, and
>
> Second, that the particular defendant was a member of the conspiracy at the time the substantive offense was committed.
>
> Under the conditions just defined a defendant may be found guilty of a substantive count even though he did not participate in the acts constituting the offense as defined in the substantive count. The reason for this is

that a coconspirator committing a substantive offense pursuant to a conspiracy is held to be the agent of the other conspirators.

(Emphasis supplied.) This instruction, apart from the emphasized portion, was taken verbatim from 2 E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions* § 27.17 (1977). We have previously approved this instruction as correctly reflecting the holding in *Pinkerton. United States v. DeLuna,* 763 F.2d 897, 917–18 (8th Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985). The emphasized portion merely instructs the jury that they may find Thirion guilty of the substantive offenses under *Pinkerton,* even though they cannot find him guilty on the conspiracy count.

These defendants' further contention that the *Pinkerton* instruction relieved the government of its burden of proof on the substantive counts is wholly without merit. The *Pinkerton* instruction states that the essential elements of the substantive counts must be proven beyond reasonable doubt before the jury may find coconspirator liability.

of both *mens rea* (criminal intent) and an *actus reus* (wrongful act). *United States v. Apfelbaum*, 445 U.S. 115, 131, 100 S.Ct. 948, 957, 63 L.Ed.2d 250 (1980). In the *Pinkerton* analysis the *actus reus* of the substantive offense may be supplied by a fellow conspirator and the defendant's knowledge or participation in that act is not required. The *mens rea* necessary to transform the act into a criminal offense is evidenced by the defendant's participation in the conspiracy. Therefore, proof of a conspiracy may serve two ends: first, in itself it is a criminal offense; second, it is evidence of the criminal intent to commit other substantive offenses.

Even though Congress has created a separate crime of conspiracy, it is settled that joint participators in the commission of the substantive offenses may be denominated as conspirators. The conspiracy may be shown as an evidentiary fact to prove participation in the substantive crime.

*United States v. Hoffa*, 349 F.2d 20, 41 (6th Cir.1965) (citation omitted), *aff'd*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); *see also United States v. Papia*, 409 F.Supp. 1307, 1316 (E.D.Wisc.1976), *aff'd*, 560 F.2d 827 (7th Cir.1977). Consequently, the issue is whether the doctrine of speciality prohibits the government from establishing Thirion's membership in the conspiracy as an evidentiary fact to prove guilt in the other substantive crimes.

■■■■ The courts which have addressed this issue concluded that the doctrine of speciality does not alter existing rules of evidence or procedure.

It is clear … that even as the speciality doctrine has been defined and broadened in this century, it has never been construed to permit foreign intrusion into the evidentiary or procedural rules of the requisitioning state, as distinguished from limiting the jurisdiction of domestic courts to "try or punish the fugitive for any crimes committed before the extradition, except the crimes for which he was extradited."

*United States v. Flores*, 538 F.2d 939, 944 (2d Cir.1976) (quoting Friedmann, Lissitzyn & Pugh, *International Law* 493 (1969)); *see also United States v. Kember*, 685 F.2d 451, 458 (D.C.Cir.), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 72 (1982). We agree. The doctrine of speciality "reflects a fundamental concern of governments that persons who are surrendered should not be subject to indiscriminate prosecution by the receiving government.…" *Fiocconi v. Attorney General*, 462 F.2d 475, 481 (2d Cir.), *cert. denied*, 409 U.S. 1059, 93 S.Ct. 552, 34 L.Ed.2d 511 (1972). Neither Thirion nor Monaco should be heard to complain because Thirion was tried only for those crimes for which he was extradited.

### III.

Thirion claims that both his constitutional and statutory rights to a speedy trial were violated. Thirion was apprehended in Monaco on March 29, 1985. He was arrested and confined at the request of the United States. Thirion contends that he communicated a desire to waive extradition: once to the Procurator of Monaco and twice to United States diplomatic staff. Nonetheless, Thirion was formally extradited, and on June 26, 1985 Monaco released him into the custody of a United States Marshal for transportation to South Dakota. Thirion first appeared before a United States judicial officer on June 28, 1985 when he appeared before a United States Magistrate for arraignment. The first day of trial commenced on October 23, 1985.

■■■■ Thirion's statutory right to a speedy trial did not accrue until he appeared before a judicial officer of the District of South Dakota. 18 U.S.C. § 3161(c)(1). Accordingly, the seventy days, *id.*, within which Thirion was to be tried did not begin to run until June 28 when he was arraigned. Thirion's trial commenced on October 23, 1985, one hundred sixteen days after his arraignment. All but thirty-four of those days are not included, however, due to pretrial motions made by Thirion. §§ 3161(h)(1)(F) and (J). Therefore, Thirion was brought to trial well within the statutory speedy trial period.

Thirion also asserts that his right to a speedy trial as guaranteed by the sixth amendment was violated. Sixth amendment challenges receive separate review distinct from the Speedy Trial Act, *United States v. Gonzalez*, 671 F.2d 441, 442–43 (11th Cir.), *cert. denied*, 456 U.S. 994, 102 S.Ct. 994, 73 L.Ed.2d 1271 (1982), although it is an unusual case in which the sixth amendment right has been violated when the act's time limit has been met. *United States v. Nance*, 666 F.2d 353, 360 (9th Cir.), *cert. denied*, 456 U.S. 918, 102 S.Ct. 1776, 72 L.Ed.2d 179 (1982). In determining whether a defendant's sixth amendment speedy trial right has been violated, we consider four factors: "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972) (footnote omitted). Two hundred eight days elapsed from the time of Thirion's arrest in Monaco until the first day of trial. Thirion attempts to attribute the ninety-two-day delay between his arrest in Monaco and his arraignment in the United States to the government. Thirion contends that he attempted to waive extradition and return to the United States. His contention is supported only by his own testimony and is inconsistent with his flight to Europe, decision to remain abroad when he learned of the indictment against him and his strong reliance on the terms of the extradition. Absent evidence of any formal waiver of extradition, we are unwilling to attribute to the government any delay caused by formal extradition proceedings initiated in compliance with the treaty. Upon Thirion's return to the United States, the case proceeded to trial in an expeditious and timely manner as noted in the previous discussion concerning the Speedy Trial Act.

Thirion states in his brief that he "consistently and continually requested a speedy trial." The only assertion of that right which we have encountered in the record is his September 24, 1985 motion to dismiss for lack of speedy trial. Coincidentally, this motion came contemporaneously with this court's vacating and remanding for new trial the cases of defendants Sablosky and Casperson. Thirion's assertion of his speedy trial right when the prospect of joinder with Sablosky and Casperson became imminent is uncompelling, particularly when contrasted with his previous willingness to delay in order to obtain the deposition testimony of foreign witnesses.

Thirion complains that the lack of speedy trial prejudiced his defense because of his continuous incarceration. Thirion fails, however, to explain how a speedy trial would have ameliorated the prejudice. Thirion's incarceration was a result of the district court's finding that he was a flight risk. The extent to which Thirion's confinement impinged on his ability to prepare his defense was lessened by the district court's allowing him furloughs from jail to meet with his attorney.

Weighing the four *Barker* factors, we conclude that Thirion's sixth amendment right to a speedy trial was not violated.

## IV.

At the sentencing of defendants Casperson and Sablosky in the first trial, the district judge made the following comments:

I certainly don't want to prejudice Mr. Thirion's case, if he is apprehended and returned here and he may have some defense that we are not aware of and which neither the government nor the defendants saw fit to present. But, on the basis of the testimony that I have heard and on the basis of the evidence presented by the various victims here, I would agree with both the victims and the defendants that the conduct of Mr. Thirion was considerably greater than the criminal conduct of any of the defendants here on trial. He certainly got most of the money and got a disproportionate amount of the money that was obtained from the victims. Now, having said that Mr. Thirion on the basis of the evidence up to this point is the most culpable is not to say that the defendants present here have no culpability.

On the basis of this statement Thirion moved the judge to recuse himself from presiding at the second trial. 28 U.S.C. §§ 144 and 455. The district court denied Thirion's motion.

In reviewing the district court's decision, we will not reverse absent an abuse of discretion. *In Re Federal Skywalk Cases,* 680 F.2d 1175, 1183 (8th Cir.), *cert. denied,* 459 U.S. 988, 103 S.Ct. 342, 74 L.Ed.2d 383 (1982); *see also United States v. Faul,* 748 F.2d 1204, 1210 (8th Cir.1984) (challenges under §§ 144 and 455 may be considered together), *cert. denied,* 472 U.S. 1027, 105 S.Ct. 3500, 3501, 87 L.Ed.2d 632 (1985). In order for the allegations of bias or prejudice "to be disqualifying [they] must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." *United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966) (Harlan, J., dissenting); *Faul,* 748 F.2d at 1211.

> The rule of law, without belaboring the point, is that what a judge learns in his judicial capacity—whether by way of guilty pleas of codefendants or alleged coconspirators, or by way of pretrial proceedings, or both—is a proper basis for judicial observations, and the use of such information is not the kind of matter that results in disqualification. Rules against "bias" and "partiality" can never mean to require the total absence of preconception, predispositions and other mental habits. . . .

*United States v. Bernstein,* 533 F.2d 775, 785 (2d Cir.), *cert. denied,* 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976), *cited with approval in Hale v. Firestone Tire & Rubber Co.,* 756 F.2d 1322, 1329 (8th Cir.1985). Judge Jones' observation came entirely from his participation at the previous trial. To accept Thirion's argument would mean that no judge could preside at a second trial upon remand from an appellate court. The district court did not abuse its discretion in denying Thirion's motion for recusal.

## V.

Upon remand from their first appeal the trials of Casperson and Sablosky were joined with Thirion's. Defendants objected to joinder and moved for severance. Casperson and Sablosky argue on appeal that the district court erred in permitting joinder. "Generally persons charged with conspiracy are to be tried together." *United States v. Moeckly,* 769 F.2d 453, 465 (8th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1196, 89 L.Ed.2d 311, —— U.S. ——, 106 S.Ct. 1947, 90 L.Ed.2d 357 (1986). The district court liberally granted requests from defendants for limiting instructions to prevent prejudice. The effectiveness of these instructions was demonstrated by Sablosky's conviction on only two of the ten counts against him. Defendants have failed to show clear prejudice and an abuse of discretion necessary for reversal. *See United States v. Miller,* 725 F.2d 462, 467 (8th Cir.1984).

## VI.

The final issue raised by Casperson in his appeal is that the district court erred in refusing to give a limiting instruction regarding the testimony of Andy Nicholaw. The rules of evidence provide for such an instruction.

> When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly.

Fed.R.Evid. 105. A request for a limiting instruction should be specific and timely. 21 C. Wright and K. Graham, Jr., *Federal Practice and Procedure* § 5065 p. 327 (1977); *see also* Fed.R.Evid. 103. Casperson requested an instruction limiting the jury's "consideration of all of [Nicholaw's] testimony except his testimony concerning contacts with Jack Casperson and that they may not be considered against Mr. Casperson, with the exception of those that directly deal with him." This request came after the government's direct examination, the cross-examinations by Thirion and Sablosky, and immediately before Casperson's

own cross-examination. On appeal Casperson has first identified those portions of Nicholaw's testimony to be limited.[7] Casperson's request may have been specific enough had it immediately followed the offending testimony. Likewise, the request would have been timely had it been made with greater specificity identifying the subject of the testimony to be limited. Because of its deficiency, however, the request was neither timely nor specific and the district court did not abuse its discretion by not giving the requested limiting instruction.

## VII.

■ Sablosky raises three separate incidents of prosecutorial misconduct. The first need not detain us long. Sablosky contends that the government suppressed exculpatory evidence by not revealing that one of its witnesses held the opinion that Sablosky was innocent. The government denies any knowledge of the opinion held by the witness. Standing alone, such evidence is not truly exculpatory evidence because it is inadmissible as it invades the province of the jury. *United States v. Ariza-Ibarra,* 605 F.2d 1216, 1226 & n. 13

(1st Cir.1979), *cert. denied,* 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981); *Wesson v. United States,* 164 F.2d 50, 55 (8th Cir.1947); *see also* Fed.R.Evid. 701.

■ The second incident involved the government's cross-examination of Sablosky in which it elicited Sablosky's legal representation of a reputed organized crime member. The relevant portion of the record is set forth in the margin.[8]

"The district court has broad discretion in determining whether an improper question has so tainted the trial as to require mistrial." *United States v. Clinton,* 711 F.2d 115, 117 (8th Cir.1983). The questions came early in a lengthy trial and the subject did not subsequently resurface. Sablosky's answer linked a client who had defrauded him to organized crime, not Sablosky himself. Accordingly, while we reject the belated reasoning given by the government to establish the relevancy of the inquiry (particularly when it was not argued to the district court), we conclude that the district court did not abuse its discretion in denying Sablosky's motion for a mistrial.

We find the final incident of alleged prosecutorial misconduct more troubling. On the morning that Sablosky took the stand

---

7. Casperson objects to two areas of Nicholaw's testimony. The first involved an "exclusive" right to market tuna which had apparently been granted by Thirion to two persons. This can hardly amount to reversible error as a previous witness testified regarding this same matter. The second area concerned other advance-fee loan schemes Thirion had been involved in prior to the date of the conspiracy alleged in this case. This occupied approximately two pages of the printed transcript of Nicholaw's testimony.

8. Q. (By the Government) Are you familiar with the phrase, advance fee loan sham or advance fee loan fraud?
 A. (Sablosky) Yes.
 Q. Did you tell Ron Wealing that you had been a victim of such a crime in the past ...?
 A. Yes, sir, I did.
 Q. When was it that you were a victim of an advance fee loan fraud?
 A. Sometime in 1977, I think, 1976.
 Q. Did you pay an advance fee?
 A. Yes.
 Q. How much of an advance fee did you pay?
 A. It cost me initially $3,000....
 Q. Were you involved at that time with an individual by the name of Sony Santini?
 A. A client of mine, yes, sir.

[At this point Casperson asked for and received a limiting instruction.]
 Sablosky's Attorney: May we interpose an objection on the grounds of relevance, Your Honor, and outside the scope of this investigation.
 The Court: The objection will be overruled at this point [ ].
 Q. Mr. Santini was your client?
 A. That's correct.
 Q. Was he ultimately convicted involving this advance fee loan scheme that you're saying you were a victim of?
 A. That is my understanding.
 Q. Does Mr. Santini also go by the name John Santiago?
 A. Yes, sir.
 Q. Does he have connections with the Gambino family in New York?
 A. I believe he knew someone from that family. What the connections were, I can't tell you.
 Q. Joey Gambino—
At this point the district court sustained Thirion's relevancy objection and the court recessed for the day. The following morning Sablosky unsuccessfully moved for a mistrial.

to testify in his defense, the government delivered to him a "target" letter advising him that he was under investigation by the grand jury for allegedly committing perjury when testifying at his first trial.[9] The letter was purportedly delivered to allow Sablosky an opportunity to testify before the grand jury if he so desired. A second letter was delivered the next day which apparently corrected a typographical mistake. The following day Sablosky moved for a mistrial.

■ The government argues that the letter was delivered in order to prevent the appearance of prosecutorial vindictiveness should Sablosky be acquitted at his second trial. We agree with the district court that the timing of the letters is highly suspect. However, in situations involving prosecutorial misconduct the touchstone "is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982). Despite the letters, Sablosky testified fully in his defense and did not allege that his testimony would have differed. The district court expressed its intent to grant an immediate mistrial should Sablosky's scrutiny by the grand jury become public. Therefore, we find that the district court did not err in refusing to grant a mistrial. Nonetheless, we do not condone the actions of the prosecutor and we caution him to be more circumspect in the future.

## VIII.

■ Sablosky finally challenges the sufficiency of the evidence to sustain his conviction. On such challenges our standard of review is oft-stated.

An appellate court reviewing the sufficiency of the evidence to support a conviction must view the evidence in the light most favorable to the verdict, accepting all reasonable inferences that logically arise from this evidence. The evidence need not "exclude every other hypothesis except that of guilt [so long

as it is] sufficient to convince the jury beyond a reasonable doubt that the defendant is guilty."

*United States v. Wilson*, 787 F.2d 375, 381 (8th Cir.1986) (citations omitted) (quoting *United States v. Shahane*, 517 F.2d 1173, 1177 (8th Cir.), *cert. denied*, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 124 (1975)). Sablosky's mail fraud conviction arises out of the letter he sent to investors advising them that he held valuable stocks in his attorney trust account to secure their fee payments. The jury could reasonably find this letter fraudulent for several reasons.

First, Sablosky wrote that the securities were held in his attorney's trust account. In fact, they were segregated in a locked portion of his desk. Such an arrangement is inconsistent with the language of the letter. A reasonable juror could conclude that the intent of the letter was to convey a greater sense of security than the unembellished facts would warrant.

Second, Sablosky stated that the assignment of the tuna commissions from Casperson would have been of itself adequate consideration for IBS to guarantee the notes. Sablosky, however, calculated the tuna commissions to be worth $180,000.00 while the advance fees paid by investors totalled approximately $498,000.00. It is anomalous to suggest that the tuna commissions offered adequate security.

Third, Sablosky contends that the unrebutted testimony of John Flandreau established that he could reasonably believe that the securities were of adequate value to secure the investors' payments. Flandreau's valuation could have been discounted by the jury for several reasons. Flandreau did not possess a degree in accounting. Flandreau's valuation of the corporation was based on several elements: Victor Brown patents, acquisition of another company (Fourth Sink) and goodwill. Flandreau's valuation of the patents was based on the opinion of an engineer who had not even examined the patents (another engineer to whom Flandreau showed the pat-

---

9. We note that Sablosky was subsequently indicted and convicted of perjury. His conviction has recently been affirmed by another panel of this court. *United States v. Sablosky*, 810 F.2d 167 (8th Cir.1987).

ents placed no value on them). Further, another witness (Nicholaw) testified that the Brown technology had limited application to the use to which Thirion intended to put it. The value of the Fourth Sink acquisition was limited as only a small portion of its purchase price had actually been paid. As to the goodwill, the jury could reasonably discount any value attached to it as the corporation had not advanced beyond the development stage.

Finally, the jury could reasonably infer from the tenor of the letter that the investors were led to believe that the securities had an immediate market value. Sablosky admitted that the securities had no immediate market value. Accordingly, we hold that sufficient evidence existed in the record for the jury to conclude that Sablosky committed mail fraud when he sent the letter. Likewise, the evidence is sufficient to sustain his conspiracy conviction.

### IX.

■ Thirion's final claim of error is that the district court imposed a disproportionate and indefinite sentence. " 'A sentence is generally not subject to review unless it exceeds statutory limits, violates constitutional or procedural requirements, or reflects that the district court failed to exercise its discretion or manifestly or grossly abused its discretion.' " *United States v. Goeller,* 807 F.2d 749, 751 (8th Cir.1986) (quoting *United States v. Rosandich,* 729 F.2d 1512, 1512 (8th Cir.1984) (per curiam)). Thirion's five-year prison sentence is well within the statutory limit. Further, the greater length of his sentence as compared to those of the other defendants is not an abuse of discretion.

■ Thirion's argument that the district court erred in ordering restitution is without merit. Thirion contends he did not receive the required statutory notice that the district court was considering imposing restitution. 18 U.S.C. § 3553(d). The effective date of the statute, however, is November 1, 1986. *See* 18 U.S.C.A. § 3551 note (West Supp.1986). Accordingly, the notice provision does not apply to Thirion's prior sentencing. Thirion's argument re-

garding the constitutionality of the Victims Protection and Restitution Act of 1982 rests on the infirm ground of the subsequently reversed district court opinion in *United States v. Welden,* 568 F.Supp. 516 (N.D.Ala.1983), *reversed in relevant part and remanded sub nom., United States v. Satterfield,* 743 F.2d 827 (11th Cir.1984), *cert denied,* 471 U.S. 1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985). This court has likewise rejected a constitutional challenge to the act. *United States v. Florence,* 741 F.2d 1066, 1067–69 (8th Cir.1984). A review of the district court's restitution order does not reveal that the court otherwise erred in determining the amount or manner of payment.

### X.

Finding no error, the convictions of all three defendants are, in all respects, affirmed.