NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 22-1422
_____

UNITED STATES OF AMERICA

v.

ADELFO RODRIGUEZ-MENDEZ,
a/k/a MEXICAN MIKE,
                                        Appellant
_____

On Appeal from the United States District Court
For the Western District of Pennsylvania
(D.C. No. 1-17-cr-00015-001)
District Judge:  Honorable Stephanie L. Haines
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
January 9, 2023

Before:  JORDAN, PHIPPS and ROTH, *Circuit Judges*

(Filed: May 11, 2023)
_____

OPINION*
_____

_____

   * This disposition is not an opinion of the full court and, pursuant to I.O.P. 5.7, does not constitute binding precedent.

JORDAN, *Circuit Judge*.

Adelfo Rodriguez-Mendez appeals numerous aspects of the criminal proceedings leading to his conviction and sentencing for dealing drugs. For the following reasons, we will affirm.

## I. BACKGROUND

In 2010, Rodriguez-Mendez opened an auto repair shop in Erie, Pennsylvania, called East Coast Monster Garage ("Monster Garage"), and at some point thereafter began using the garage as a front for trafficking drugs. He was running Monster Garage when law enforcement, with the help of a confidential informant ("C.I."), executed two "controlled buys" there in July 2016 and March 2017. The government indicted Rodriguez-Mendez and four confederates in June 2017.[1] Federal law enforcement officials then arrested Rodriguez-Mendez near the U.S.-Mexico border in Southern California. (District Court Docket Item ("D.I.") 100 at 3.)

While detained pending trial, Rodriguez-Mendez filed various motions germane to this appeal. He filed two motions to dismiss the charges against him, one in July 2020, alleging that he was arrested on an unsigned warrant, and another in May 2021, arguing that the four-year-long delay in going to trial violated his speedy-trial rights. The District Court denied both motions. He also filed various motions in limine raising evidentiary

---

[1] The government filed a superseding indictment in July 2017, adding a new count of an alleged money-laundering conspiracy between Rodriguez-Mendez and a newly introduced co-defendant, Gaudalupe Beserra. The government ultimately dismissed that additional count on the eve of trial, but the superseding indictment remained as the operative indictment.

and constitutional objections to the admission of undercover audio recordings of the C.I., primarily because the C.I. had since died and thus could not confirm the authenticity of the recordings or be cross-examined. The District Court granted in part and denied in part the motions in limine. Essentially, the court prohibited the introduction of any and all statements made by the deceased C.I. to law enforcement as inadmissible hearsay, and all testimonial statements made by the C.I. to law enforcement as violations of the Sixth Amendment. But the Court reserved ruling on the authentication of the undercover recordings pending a proffer of evidence from the government at trial and denied Rodriguez-Mendez's request to exclude the undercover recordings as violations of the Sixth Amendment because we had already held in *United States v. Hendricks*, 395 F.3d 173 (3d Cir. 2005), that undercover recordings are not testimonial for purposes of *Crawford v. Washington*, 541 U.S. 36 (2004). Ultimately, the Court concluded that the proffer of testimony of the undercover agent involved in the recording, in addition to a cooperating defendant, met the government's burden under Federal Rule of Evidence 901(a) for authentication, and, accordingly, the recordings were admitted in evidence.

After Rodriguez-Mendez's two-day trial, the jury returned a verdict convicting him of three counts in the superseding indictment: Count I, Conspiracy to Possess with Intent to Distribute and to Distribute Less than Five Hundred (500) Grams of a Mixture and Substance Containing a Detectable Amount of Cocaine, and Counts II and V, both of which charged Possession with Intent to Distribute and Distribution of Less than Five

Hundred (500) Grams of a Mixture and Substance Containing a Detectable Amount of Cocaine.[2]

Rodriguez-Mendez moved for a judgment of acquittal before the case was submitted to the jury, but the District Court denied that motion as well. After the guilty verdict was handed down, Rodriguez-Mendez renewed his motion for acquittal and also moved for a new trial on the ground that the Court had erred in admitting the undercover recordings. The Court denied both motions, holding that the evidence adduced at trial was sufficient to support the jury verdict and that the admission of undercover recordings did not necessitate a new trial since the recordings were adequately authenticated.

Finally, at sentencing, the District Court increased Rodriguez-Mendez's sentencing range based on a finding that, by a preponderance of the evidence, Rodriguez-Mendez had trafficked between 5 and 15 kilograms of cocaine during the conspiracy.

## II.     DISCUSSION[3]

### A.     The District Court properly denied Rodriguez-Mendez's motion to dismiss the Superseding Indictment.[4]

Rodriguez-Mendez argues that the warrant used to arrest him was somehow constitutionally defective under the Fourth Amendment because it was unsigned by the

---

[2] Count II was based on the July 2016 controlled buy; Count V was based on the March 2017 controlled buy.

[3] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291.

[4] "We apply a mixed standard of review to a district court's decision on a motion to dismiss an indictment, exercising plenary review over legal conclusions and clear error

4

clerk of the court, and therefore the charges against him should have been dismissed.[5] In

*United States v. Crews*, 445 U.S. 463 (1980), the Supreme Court, in addressing whether

an in-court identification of a defendant by a victim should be suppressed as the fruit of a

defendant's unlawful arrest, held that "[a]n illegal arrest, without more, has never been

viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction." *Id.* at

474. The Court went on to discuss how the exclusionary rule is a citizen's protection

against police misconduct but that the defendant was "not himself a suppressible fruit,

and [that] the illegality of [a defendant's] detention cannot deprive the Government of the

opportunity to prove his guilt through the introduction of evidence wholly untainted by

the police misconduct." *Id.* (internal quotations omitted). Thus, even if an arrest is

unsupported by probable cause, the exclusionary rule in the form of suppressed evidence,

not dismissal of the indictment, is the remedy. *Id.* Here, Rodriguez-Mendez does not

dispute that probable cause supported his arrest. Nor does he contend that any unlawfully

obtained evidence was admitted against him. Therefore, even if the arrest warrant were

technically deficient, his conviction would still stand because the arrest was amply

supported by probable cause. In any event, however, it appears the warrant was in fact

signed by the clerk.

---

review over factual findings." *United States v. Stock*, 728 F.3d 287, 291 (3d Cir. 2013).

[5] Federal Rule of Criminal Procedure 9 governs arrest warrants on an indictment, which provides that such arrest warrants "must be signed by the clerk." Fed. R. Crim. P. 9(b)(1).

Although the initial public docket reflected an unsigned arrest warrant (D.I. 56), the Deputy Clerk testified under oath that standard procedure in the clerk's office after receiving an order to issue a warrant was to generate the warrant, "print three copies … sign them … and give them to the [United States] [M]arshals[,]" after which an unsigned copy was then filed on the public docket. (Supp. App. Vol. II at 791-94.) She also testified that a signed arrest warrant does not appear on the docket until after it is returned executed by the U.S. Marshals. (*See id*. at 797.) That process was evidently followed here. (*See id*. at 790-97; *see also* App. Vol. I at 42.) The record clearly shows that the warrant was signed by the clerk on the same day the warrant issued but was not publicly filed until after it was executed, per standard procedure. (D.I. 100). Based on this, the District Court did not clearly err when it relied on the Deputy Clerk's credible, uncontradicted testimony to hold that Rodriguez-Mendez's arrest warrant comported with Rule 9 of the Federal Rules of Criminal Procedure. And Rodriguez-Mendez has not pointed to any authority indicating that a properly signed warrant left under seal somehow violates Federal Rule of Criminal Procedure 9, or the Constitution. Thus, we will affirm the Court's denial of Rodriguez-Mendez's motion to dismiss his superseding indictment based on an allegedly faulty warrant.

**B.      The government did not violate Rodriguez-Mendez's Sixth Amendment right to a speedy trial.[6]**

Rodriguez-Mendez does not appeal the District Court's determination that his 49-month pretrial delay did not violate the Speedy Trial Act; he appeals only the Court's

---

[6] In assessing a constitutional speedy trial claim, "[w]e review the District Court's

Sixth Amendment ruling. The District Court held that while the delay in bringing this case to trial was lengthy, the delay was "understandable and excusable." (App. Vol. 1 at 69.) Upon review of the record and the District Court's constitutional analysis, we agree.

In *Barker v. Wingo*, 407 U.S. 514 (1972), the Supreme Court laid out a four-factor balancing test to assess constitutional speedy trial claims. The *Barker* inquiry focuses on: "(1) the length of the delay before trial; (2) the reason for the delay and, specifically, whether the government or the defendant is more to blame; (3) the extent to which the defendant asserted his speedy trial right; and (4) the prejudice suffered by the defendant." *United States v. Velazquez*, 749 F.3d 161, 174 (3d Cir. 2014) (citing *Barker*, 407 U.S. at 530-31). "No one factor is dispositive nor talismanic." *Id.* (cleaned up).

The first factor is generally considered a "triggering mechanism" or gateway to analyzing the remaining three factors, *Barker*, 407 U.S. at 530, and the parties agree that the 49-month delay at issue here is sufficiently lengthy to trigger a speedy trial analysis. Turning to the second *Barker* factor, the delay in this case stemmed primarily from the multiple continuances filed by the defendants and the District Court's order suspending jury trials because of the Covid-19 global pandemic. Rodriguez-Mendez argues that those factors were outside of his control since his co-defendants filed the majority of the extensions without his consent,[7] and he certainly did not cause a global pandemic.

---

factual findings for clear error and [its] legal conclusions de novo. *United States v. Shulick*, 18 F.4th 91, 102 (3d Cir. 2021).

[7] *See* App. Vol. I at 49-57 (setting forth the District Court's detailed recital of the lengthy procedural history of this case, including the multiple continuances).

While it is true that Rodriguez-Mendez did not join in many of the requests for extensions, neither did he file any objections to them nor a motion to sever. He also does not point us to where in the record he expressed concern over the multiple extensions. As to the pandemic delays, *Barker* clarifies that deliberate attempts to delay trial to hamper the defense are weighted heavily against the government while more neutral reasons ("such as negligence or overcrowded courts") are weighted "less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Id.* at 531. The *Barker* Court noted, however, that valid reasons ("such as a missing witness") may justify appropriate delay. *Id.*

We have not addressed a Sixth Amendment speedy trial claim in the context of the delays engendered by the Covid-19 pandemic, but it is plain that the suspension of jury trials fits into the category of justifiable delay. There is no indication that the government used the delay to its advantage or to hamper Rodriguez-Mendez's defense. Regardless, even a delay for neutral reasons, as the *Barker* Court instructed, is still something that must be considered, though weighed less heavily. Given the dramatic countervailing considerations associated with the pandemic, we accord this factor very little weight.

As to the third factor, the record shows, and Rodriguez-Mendez does not contest, that he did not assert his speedy trial rights until May 2021, well after the height of the pandemic, and nearly four years after his arrest and just two months before his trial. This factor weighs against Rodriguez-Mendez since, as *Barker* states, "[t]he more serious the deprivation, the more likely a defendant is to complain." *Id.*

8

The fourth factor in *Barker* instructs that prejudice should be assessed in light of the general interests that defendants share and that the speedy trial guarantee was meant to protect, such as the need "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Id.* at 532. Rodriguez-Mendez claims that, during what he describes as an oppressively long pretrial incarceration, he experienced "great anxiety" while being in lock down conditions, lost his business, was separated from his children, and witnesses disappeared or died before trial. (Opening Br. at 10-11.) He asserts that these occurrences caused him "immense prejudice[,]" and curtailed his ability to mount his defense. (Opening Br. at 11.) Without taking his arguments lightly, we nonetheless find them unpersuasive.

As stated earlier, Rodriguez-Mendez waited nearly four years to assert his speedy trial rights, thus undermining the assertion that he suffered "immense prejudice" throughout. Furthermore, the "business" that Rodriguez-Mendez claims he lost was, in fact, the central hub of the criminal conspiracy. And, the witnesses who disappeared or died while awaiting trial were actually the government's witnesses, and, if anything, their absence helped rather than hurt his case. It is difficult to see how these collateral effects of the delay prejudiced him. Of course, pretrial detention is naturally rife with the anxiety of living "under a cloud of suspicion[,]" *Barker*, 407 U.S. at 534, but, as just noted, the delay at issue here was due to his codefendants' requests for multiple extensions (without objection by him), his own filings for extensions, and a global

9

pandemic that was outside any parties' control and implicated weighty public health concerns.

Finally, we are persuaded by our sister circuits that "it will be an unusual case in which the [Speedy Trial] Act is followed but the Constitution violated." *See United States v. Rice*, 746 F.3d 1074, 1081 (D.C. Cir. 2014) (internal quotation marks omitted) (citing *United States v. Bieganowski*, 313 F.3d 264, 284 (5th Cir. 2002)).[8] In other words, a violation of the Speedy Trial Act is generally a necessary condition for a holding that there has been a Constitutional violation. Rodriguez-Mendez does not even argue that his Speedy Trial Act rights were violated, and given the foregoing *Barker* analysis, we do not consider this to be the "unusual" case where the Constitution is nevertheless violated. Therefore, we hold that the delay between indictment and trial here did not so prejudice Rodriguez-Mendez's Sixth Amendment rights as to warrant relief.

### C. The District Court did not err in its denial of Rodriguez-Mendez's motion for a new trial based on the admission of the undercover recordings.[9]

Rodriguez-Mendez relies heavily on our decision in *United States v. Starks*, 515 F.2d 112 (3d Cir. 1975), to assert that the government did not meet its burden in

---

[8] *See also United States v. Nance*, 666 F.2d 353, 360 (9th Cir. 1982), *United States v. Thirion*, 813 F.2d 146, 154 (8th Cir. 1987), *United States v. Davenport*, 935 F.2d 1223, 1238-39 (11th Cir. 1991), *United States v. O'Dell*, 247 F.3d 655, 666-67 (6th Cir. 2001), and *United States v. Munoz–Amado*, 182 F.3d 57, 61 (1st Cir. 1999).

[9] Review of a decision on a motion for a new trial is for "abuse of discretion unless the court's denial of the motion is based on application of a legal precept, in which case our review is plenary." *Curley v. Klem*, 499 F.3d 199, 206 (3d Cir. 2007). Because the District Court denied the motion based on its legal interpretation of the Federal Rules of Evidence, we exercise plenary review. *See Sharif v. Picone*, 740 F.3d 263, 267, 272

10

authenticating the undercover recordings of a now-deceased C.I. who was unavailable to testify at trial. In *Starks*, we adopted a "clear and convincing" standard for authenticating recordings, identifying seven factors for consideration:

> (1) the recording device was capable of taking the conversation …
> offered in evidence.
> (2) the operator of the device was competent to operate the device.
> (3) the recording is authentic and correct.
> (4) changes, additions or deletions have not been made in the
> recording.
> (5) the recording had been preserved in a manner that is shown to the
> court.
> (6) the speakers are identified.
> (7) the conversation elicited was made voluntarily and in good faith,
> without any kind of inducement.

*See id.* at 121 n.11 (citing *United States v. McKeever*, 169 F. Supp. 426, 430 (S.D.N.Y. 1958)).

The government argues that, because Federal Rule of Evidence 901(a) was adopted after *Starks,*[10] it necessarily supersedes *Starks*, and thus its less rigid authentication standard should apply. Since the government wins under either standard, we need not decide that question.

Because the *Starks* standard is more exacting, we begin and end our analysis there. To begin, the parties do not dispute that the first and fifth *Starks* factor were satisfied. As

---

(3d Cir. 2014) ("A district court's interpretation of the Federal Rules of Evidence is reviewed de novo").

[10] *Starks* was decided in April 1975, just a few months before the effective date of the Federal Rules of Evidence. The Rules were adopted by the Supreme Court of the United States on Nov. 20, 1972, and, by Pub. L. 93-595, Jan. 2, 1975, 88 Stat. 1926, were enacted, with amendments made by Congress to take effect on July 1, 1975.

11

to the other factors, Rodriguez-Mendez argues primarily that only the "operator" of the recording device – i.e., the C.I. – could authenticate competent operation of the device; he also argues that since the recording was in Spanish, the English-speaking undercover agent recording the conversation could not attest to the recording's accuracy, and the government's attempt to use a Spanish-speaking cooperating defendant to attest to its accuracy – as well as to identify the speakers – was inadequate. During trial, the government countered those arguments by offering the combined testimony of Pennsylvania State Police Corporal Kristen Beattie, who directed the controlled buys, and cooperating co-defendant Geneva Gore, one of Rodriguez-Mendez's co-conspirators, to authenticate the recordings.

Beattie, based on her four years of experience working with undercover recording technology, testified to the capabilities of the technology, that the C.I. was competent to operate the device and voluntarily did so, that the recording, even if in a different language, "accurately captured the conversations that she heard live during the controlled buys," that the recordings were complete, uninterrupted, without breaks, edits, cuts or disruptions, and that they were preserved.[11] (Answering Br. at 31.) Beattie also testified that she saw Rodriguez-Mendez outside the Monster Garage when the C.I. arrived and then saw him walk into the garage with the C.I. Gore testified that she has known Rodriguez-Mendez since 2011, saw him multiple times a week, spoke on the phone with him on most days, and accordingly could and did identify his voice on the recordings.

---

[11] Notably, Rodriguez-Mendez stipulated that the translations of the recordings were accurate.

She also clarified in her testimony that, even though she did not recognize one of the voices on the recording, she could distinguish the C.I. and Rodriguez-Mendez's voices from the unrecognized voice, and she did so at trial. Taken together, the testimony given by Beattie and Gore is more than sufficient evidence to support a finding that the recordings were what the government claimed them to be, and thus sufficiently satisfied both *Starks* and Rule 901(a).

Rodriguez-Mendez still insists that Gore's testimony could not authenticate the recordings since she was not in the room when the deal happened and that she could not recognize every voice in the recording. But, the bar for voice identification is not high, as explained in Federal Rule of Evidence 901(b)(5), which provides that "[a]n opinion identifying a person's voice – whether heard firsthand or through mechanical or electronic transmission or recording – based on hearing the voice at any time under circumstances that connect it with the alleged speaker" satisfies authentication. Nothing in *Starks* is inconsistent with that, and Rodriguez-Mendez has cited no authority for us to think otherwise. Gore's testimony identifying Rodriguez-Mendez's voice on the incriminating recordings, when combined with Beattie's testimony that the recordings accurately represented what occurred during the transactions along with her witnessing Rodriguez-Mendez enter the garage with the C.I., is evidence sufficient to meet even the clear and convincing standard for authentication under *Starks*.

Rodriguez-Mendez also argues that his Sixth Amendment Confrontation Clause rights were violated because he could not cross-examine the deceased C.I. According to his argument, the statements made by the C.I. in the undercover recordings were

13

testimonial because they were intended "to elicit statements that would be, and were, used in a later court proceeding[,]" (Opening Br. at 16), in violation of *Crawford v. Washington*, 541 U.S. 36, 59 (2004) (holding that "[t]estimonial statements of witnesses absent from trial" are barred from being introduced unless "the declarant is unavailable, and … the defendant has had a prior opportunity to cross-examine."). We have already held, however, in *United States v. Hendricks*, that surreptitiously monitored conversations and statements contained in undercover recordings are nontestimonial for *Crawford* purposes. 395 F.3d 173, 184 (3d Cir. 2005) (holding that if statements are made "as part of a reciprocal and integrated conversation with a government informant who later becomes unavailable for trial, the Confrontation Clause does not bar the introduction of the informant's portions of the conversation as are reasonably required to place the defendant['s] … nontestimonial statements into context"). Rodriguez-Mendez recognizes that *Hendricks* is fatal to his position but avers simply that "[t]he fundamental premise of *Hendricks* is flawed and it should be overruled[.]" (Opening Br. at 15.) But, of course, *Hendricks* is still binding on us, 3d Cir. I.O.P. 9.1, and we will affirm the District Court's denial of Rodriguez-Mendez's motion for a new trial.

D. **Rodriguez-Mendez's convictions were supported by sufficient evidence.**[12]

Rodriguez-Mendez contends that the government failed to adduce sufficient evidence to support his conviction. He says that the government merely proved that he

---

[12] We apply plenary review to whether enough evidence supported a conviction. *United States v. Repak*, 852 F.3d 230, 250 (3d Cir. 2017). We construe the evidence in the light most favorable to the prosecution and draw all reasonable inferences in favor of

"kept 'bad company' or was present for some illegal activities." (Opening Br. at 17.) He points out that the government never saw him hand anyone drugs and that the evidence proved only that he "was passively aware that others were using his garage for drug transactions." (Opening Br. at 17.)

The most damning evidence that Rodriguez-Mendez must, but cannot, overcome are his admissions in the undercover recordings that plainly demonstrate he was the primary source of drugs for the C.I. Although the C.I. was dead by the time of trial, the officer who outfitted the C.I. with a wire testified about the functionality of the recording equipment, and a cooperating co-defendant confidently identified Rodriguez-Mendez's voice on the recording. What is more, additional witnesses testified that they regularly exchanged money for drugs with Rodriguez-Mendez at Monster Garage and that Rodriguez-Mendez was the leader of the conspiracy. Viewing all this evidence in the light most favorable to the prosecution and drawing all reasonable inferences in its favor, it is clear that sufficient evidence supports the verdict.

### E. The District Court did not err in its application of the Sentencing Guidelines.

Rodriguez-Mendez argues that the District Court imposed a "fundamentally unfair" sentence when it sentenced him based on facts developed at sentencing that were not proven beyond a reasonable doubt.[13] (Opening Br. at 25-26.) In other words, while

---

the jury's verdict. *United States v. Trant*, 924 F.3d 83, 86 n.1 (3d Cir. 2019).

[13] He makes a number of accompanying arguments with this primary claim, including a violation of his Sixth Amendment right to be informed of the nature and cause of the accusation against him; a violation of his Fifth Amendment indictment

the jury verdict found him guilty of distributing "less than 500 grams of cocaine," (Opening Br. at 20), the District Court, after applying U.S.S.G. § 1B1.3, sentenced him based on 5 to 15 kilograms of distribution.[14] Rodriguez-Mendez alleges that his range would have been 78-97 months if he was sentenced based only on the charges he was convicted of. With the additional drug attribution, his range jumped to 188-235 months, and he was ultimately sentenced to 210 months.

It is well-established that sentencing judges may consider "conduct that is not formally charged or is not an element of the offense of conviction" in "the determination of the applicable guideline sentencing range." *See United States v. Booker*, 543 U.S. 220, 251-52 (2005) (quoting U.S.S.G. § 1B1.3, comment. (background) (Nov. 1995)) (cleaned up). And these sentencing facts may be found by the judge upon a preponderance of the evidence. *United States v. Grier*, 475 F.3d 556, 568 (3d Cir. 2007) (en banc). Only facts

---

presentment right; and a violation of Federal Rule of Criminal Procedure 7(c)(1), which requires an indictment to contain a plain, concise, and definite written statement of the essential facts constituting the offense charged. We need not address these arguments in detail but note that they were reviewed and are without merit.

[14] U.S.S.G. § 1B1.3 is titled "Relevant Conduct (Factors that Determine the Guideline Range)" and provides that courts may determine base offense levels based on "all acts and omissions committed … by the defendant … that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense[.]" U.S.S.G. § 1B1.3(a)(1)(A). The first Application Note under this section in the Guidelines clarifies that *"[t]he principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability. … [T]he focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense …."* U.S.S.G. § 1B1.3, comment. (n.1) (emphasis added).

16

that increase a statutory minimum or a maximum sentence must be submitted to a jury and found beyond a reasonable doubt, as described in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) and *Alleyne v. United States*, 570 U.S. 99, 103 (2013). Rodriguez-Mendez's crimes did not invoke a mandatory minimum sentence, and his statutory maximum of 240 months did not increase with the District Court's attribution of additional drugs to him. Thus, the concerns involved in *Apprendi* and *Alleyne* do not apply. Rodriguez-Mendez nevertheless asks us to reject precedent and require a jury to decide facts beyond a reasonable doubt that increase the *guideline* sentencing range of a criminal defendant. That we cannot and will not do.

Thus, we are left to review the District Court's factual findings for clear error and its application of the sentencing guidelines for abuse of discretion.[15] Upon review of the record, the District Court did not clearly err when it attributed between 5 and 15 kilograms of cocaine distribution to Rodriguez-Mendez throughout the conspiracy. Multiple witnesses testified that they bought kilogram amounts of cocaine from

---

[15] Our analysis addresses mixed questions of law and fact, but, consistent with our precedent, we utilize a "unitary abuse-of-discretion standard," *United States v. Wise*, 515 F.3d 207, 217 n.5 (3d Cir. 2008) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 403 (1990)), by accepting findings of fact by the District Court (unless clearly erroneous), and granting "due deference[,]" *id.* at 218, to the District Court's application of the guidelines to the facts. *See* 18 U.S.C. § 3742(e); *see also United States v. Tomko*, 562 F.3d 558, 567-68 (3d Cir. 2009) (en banc) ("[A]n abuse of discretion has occurred if a district court based its decision on a clearly erroneous factual conclusion or an erroneous legal conclusion."). We exercise plenary review over a District Court's interpretation of the Sentencing Guidelines, *United States v. Bell*, 947 F.3d 49, 54 (3d Cir. 2020), but, based on the parties' briefing, the issue here concerns the District Court's *application* – not legal interpretation – of the Sentencing Guidelines.

Rodriguez-Mendez on a weekly or bi-weekly basis (typically one half to three kilograms were sold during each transaction). And Gore, one of the cooperating co-defendants, testified that the drug conspiracy brought at least two kilograms of cocaine into Monster Garage every two weeks during the timeframe of the conspiracy (approximately 22 months). Consequently, the District Court did not abuse its discretion when it applied guideline § 1B1.3 to increase Rodriguez-Mendez's sentencing range and subsequently impose a within-guidelines sentence.[16]

## III. CONCLUSION

For the foregoing reasons, we will affirm Rodriguez-Mendez's judgment of conviction and sentence.

---

[16] Rodriguez-Mendez contends also that his sentence was substantively unreasonable, but a within-guidelines sentence is presumptively reasonable, and he has not rebutted that presumption. S*ee Rita v. United States*, 551 U.S. 338, 347 (2007) (reviewing courts "may apply a presumption of reasonableness to a district court sentence that reflects a proper application of the Sentencing Guidelines"). Rodriguez-Mendez's sentence of 210 months as compared to some of his co-defendants' lesser sentences is easily explained by his role as the leader of the conspiracy and his decision not to benefit from the bargain of a plea deal.